

**Josh A. Marks**
Partner

Email: **jam@bhgrlaw.com**

February 18, 2022

**Via E-Mail: jackson_chambers@cod.uscourts.gov**
The Honorable R. Brooke Jackson
Alfred A. Arraj United State Courthouse
901 19th Street
Denver, CO 80294

      Re:    *Baker v. City of Aurora*, U.S. District Court, Case No: 20-cv-03612-RBJ
             Summary Judgment Position Statement

Dear Judge Jackson:

      Daisy Baker ("**Plaintiff**"), the estranged widow of the decedent, David Baker ("**Mr. Baker**"), brought this action against the City of Aurora ("**City**") and unnamed police officers in December of 2020. *See* #1.[1] While the initial Complaint included a total of five causes of action, all but one cause of action against a single defendant were voluntarily dismissed by Plaintiff on March 24, 2021. *See* #24. The sole remaining count alleges the City's failure to properly train its officers resulted in the violation of Mr. Baker's Forth Amendment rights and caused him conscious pain and suffering. *See* #1, ¶ 32. Discovery in this case has revealed that the underlying facts surrounding the events of December 17, 2018 and the death of Mr. Baker, are very different from those alleged in Plaintiff's Complaint. The City seeks summary judgment because Plaintiff cannot produce sufficient evidence to succeed on her failure-to-train theory of municipal liability in that she cannot establish the elements of a prima facie case as would be required to demonstrate the City's liability.

    **A.  Factual Background**

    **1.  Mr. Baker.**

      Mr. David Baker was married to Plaintiff and together the couple had one child, Deon. Mr. Baker formerly resided with his family but had left the residence at Plaintiff's request a few weeks prior to the events described below. Mr. Baker was a large man and a navy veteran. At 5' 9" and 237 pounds, he was categorized as obese. Mr. Baker had a history of substance abuse (alcohol and marijuana), mental illness (depression with psychotic features, PTSD, bipolar disorder), and domestic violence against both his wife and his son. Plaintiff had recently tried to obtain an order of protection to restrict Mr. Baker from contact with her.

---

[1] These and other numeric citations that follow reference the docket number filings in this matter.





Attorneys At Law

BHGRLAW.COM

Boulder, CO | 1712 Pearl St, 80302
Denver, CO | 1525 17th St., 80202
Cheyenne, WY | 1623 Central Ave., Ste 204, 82001
Irvine, CA | 300 Spectrum Center, Ste. 400, 92618

Office 303.402.1600
Fax 303.402.1601

At the time of this incident, Mr. Baker was living out of his car at an unknown location. He showed up at his former residence requesting to take a shower. Plaintiff permitted him to enter. There are varying accounts as to what triggered Mr. Baker, but it is clear that what followed was a violent outburst. Inside the home were Plaintiff, her brother's girlfriend, Maria Ahumada, and four children. Ms. Ahumada, initially called her boyfriend, Johnny Guillen, asking that he come home because Mr. Baker was holding the group hostage and threatening Plaintiff with a frying pan. Upon his arrival, Mr. Guillen observed a broken frying pan on the couch. Because Mr. Baker then attacked Mr. Guillen, Ms. Ahumada called 911. What ensued was an extraordinarily long and intense physical struggle between Aurora Police Department ("**APD**") officers and Mr. Baker where taser applications and baton strikes were not sufficient to gain compliance and end his resistance to arrest.

2. **The events of December 17, 2018.**

In response to a 911 call reporting a physical domestic disturbance and requesting assistance, three APD Officers were dispatched to an apartment on East Jewel Avenue in Aurora, Colorado the evening of December 17, 2018. The three officers, Ryan Stoller, Kacie Sawyer, and Kristi Mason arrived on scene and followed the sounds of screaming to locate the apartment. The door of the apartment was open and a woman standing just outside that door motioned for the officers to enter.[2] Inside the apartment, a chaotic family disturbance was in already in progress. Plaintiff was yelling. Mr. Baker had Mr. Guillen in a chokehold with the man's sweatshirt pulled over his head and tightened around his neck. Four wide-eyed young children stood within a few feet of the altercation barricaded behind a couch. There was also a second 911 call that came in reporting a disturbance at the East Jewell location.

With tasers drawn, the officers instruct Mr. Baker to "let go" and to "stop." After pushing Mr. Guillen onto the barricade couch, Mr. Baker turns his attention to the officers and advances in their direction. Tasers are fired as Mr. Baker charges the officers. Two taser probes make contact but neither has any effect on Mr. Baker. Mr. Baker pushes Stoller and falls to the ground on top of Mason. Once back on his feet, Mr. Baker pushes Stoller out of the apartment and across the breezeway connecting ground floor apartments. This sequence of events occurred over a span of twenty seconds.

Stoller pulls his baton and tells Mr. Baker to "get on the ground." Mason approaches the pair and is again thrown to the ground by Mr. Baker. Sawyer calls for more units. Stoller strikes Mr. Baker with his baton. Mr. Baker smiles at Stoller and advances aggressively toward him. Stoller backs up while telling Mr. Baker to "get back" and "get on the ground." Mr. Baker grabs Stoller's baton as he can be heard grunting, growling, making guttural yells, and uttering

---

[2] This description of events is taken from deposition testimony and body worn camera footage. The body worn camera footage will be submitted for the Court to view.

religious statements. As the two men struggle over the baton, Mason calls for help. Twice. Stoller attempts to get a carotid hold on Mr. Baker. Mr. Baker turns out of the carotid hold and his hands are on Stoller's neck. Sawyer and Mason are each striking Mr. Baker with a baton in an effort to free Stoller from his grip, but the strikes have no effect. Sawyer is telling Mr. Baker to "stop resisting." Mr. Baker releases Stoller and attempts to reenter the apartment just as the door is shut and locked. The Plaintiff remained outside.

Stoller tries to reason with Mr. Baker and holsters his baton. Plaintiff is yelling. Stoller tries to put his hands on Mr. Baker. Mr. Baker again grabs for Stoller's throat. Mason approaches and elbows Mr. Baker who in turn reaches for her throat. He instead grabs her jaw. Mason bites Mr. Baker and he releases his grip. The three officers together are then able to take Mr. Baker to the ground on their fourth attempt. Time from entry into the apartment to getting Mr. Baker to the ground was six minutes and six seconds.

Mr. Baker continues to resist for several more minutes as additional officers arrive to assist in the efforts to gain compliance. Sawyer and Mason each held down a kicking leg. Stoller was on Mr. Baker's backside in a rear mount position[3] using his arm to alternate between a carotid hold and a cross face technique.[4] As Stoller felt resistance, he would apply the carotid hold. When the resistance subsided, he would use the cross-face technique.

As Mr. Baker continued to kick and attempt to get up on all fours, the officers struggled to get his arms out from underneath him for handcuffing. Mr. Baker continued to kick after being handcuffed and the officers tried to use a leg hobble. Stoller got up and off of Mr. Baker as the attempt to hobble continued. The attempt at hobbling advanced no further than the waist chain. More than forty seconds after Stoller had gotten up and off of Mr. Baker, an officer stated that he was no longer kicking. At this point the officers realized that Mr. Baker appeared to be unconscious. Mr. Baker was rolled to his side and emergency medical services was called in from their staging area. Mr. Baker later was pronounced dead. [5]

Two of the three officers involved required medical attention following this incident. One officer remained on light duty due to injury for over a month.

---

[3] The rear mount position is used in ground tactics to subdue an opponent.
[4] When using a cross face control hold, the forearm is elevated to just below the cheek bone and apply pressure to sensitive parts of the head.
[5] The coroner attributed his death to positional asphyxia, but the findings of the medical examiner did not show typical indicia of asphyxia. It further showed that Mr. Baker suffered from almost completely occluded heart arteries.

B. **Summary Judgment is Appropriate.**

"[A] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Erickson v. City of Lakewood*, 489 F.Supp.3d 1192, 1207 (D.Colo. 2020) (alterations omitted) (quoting *Connick v. Thompson*, 563 U.S. 51 (2011)). To establish a city's liability under 42 U.S.C. §1983 for inadequate training of police officers in the use of force, a plaintiff must first prove the training was in fact inadequate and then must satisfy the following requirements: (1) the officers exceeded constitutional limitations on the use of force; (2) the use of force arose under circumstances that constitute a usual and recurring situation with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the part of the city towards persons with whom police officers come into contact; and (4) there is a direct causal link between the constitutional deprivation and the inadequate training. *Allen v. Muskogee, Okl.*, 119 F.3d 837, 841-842 (10th Cir. 1997) (citing *City of Canton v. Harris*, 489 U.S. 378, 389-91 (1989) ("*Canton*")). It will not suffice to prove that an injury or accident could have been avoided if an officer had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. *Valdez v. Motyka*, 2020 U.S. Dist. LEXIS 122359, *11-12 (citing *Canton*, 489 U.S. at 390-91). The deficiencies in training must have been so gross or pervasive that they can justifiably be said to represent city policy. *Canton*, 489 U.S. at 390 (quotations omitted). The City disputes Plaintiff would be able to make any of the requisite showings but for purposes of summary judgment focuses on the following four elements.

1. **Plaintiff cannot prove that the training at issue was inadequate.**

Plaintiff has suggested the City failed to train its officers with respect to the de-escalation "of situations like that presented here," and failed to forbid the use of a chokehold upon an already restrained civilian. #1, ¶32. Neither contention is supported by the facts developed during discovery.

a. **De-escalation.**

APD officers are trained to de-escalate whenever practicable. Division Chief Juul testified in his 30(b)(6) deposition that the principle of de-escalation is integrated into every concept that the APD teaches its officers through the Aurora Police Academy as well as In-Service trainings. Attendance records show that Stoller, Sawyer and Mason all received in-service training with regard to de-escalation on at least two separate occasions in 2018, in the first and third quarters. Specifically, this training included the use of de-escalation in the context of the use of force stating, "[w]hen practicable officers will attempt to de-escalate their use of force and/or the situation so that lessor force, or possibly no force, is required." Additionally, the three officers attended the Aurora Police Academy in either 2016 or 2017 where the lesson plans reflect de-escalation was included in the curriculum.

Upon deposition, Stoller specifically stated that he attempted to de-escalate the situation with Mr. Baker during the first lull in the encounter as both men were attempting to recover their breath. Sawyer and Mason both confirm that Stoller attempted to reason with Mr. Baker. This interaction is also reflected in the body worn camera footage where Stoller can be seen putting his baton back into its holster and attempting to engage verbally with Mr. Baker in a calm manner.

The record as developed demonstrates that APD officers are provided de-escalation training on a routine basis and that the officers involved here utilized that training at the moment it became practicable. Whether the officer's attempts to de-escalate were successful is irrelevant to the inquiry, especially in light of the circumstances surrounding the incident as identified above and more fully discussed below.

b. **Chokehold.**

The APD does forbid the use of the chokehold and there has been no evidence adduced to suggest otherwise. Mr. Baker was never subjected to a chokehold by APD officers. Rather, the evidence has shown that a carotid control hold was employed in the officer's attempts to stop Mr. Baker from resisting arrest and to gain compliance so that he could be handcuffed. According to the department directive 5.3.2, the carotid control hold may be used when an officer is met with violent resistance and other lesser means have been tried unsuccessfully or are not feasible. As described above, here, the officers were met with violent resistance and other lesser means, including tasers and batons, were ineffective.

The APD devoted a significant amount of time and attention including lectures, hands-on training, and written and practical tests[6] to teach the use of the carotid control hold prior to June 2020, when the practice was discontinued.[7] This training covered the length of time the

---

[6] Training subjects included in the APD carotid control hold lesson plan include: mechanics of the carotid control hold; where pressure is applied; how the technique works; explanation of what blood flow is occluded and what is not; anatomical structures of the neck; comparisons and risks of the carotid vs "chokeholds;" carotid goals, anatomy of the carotid and jugular veins; risk factors of the use of the technique; nomenclature and control hold avoidances; research and best practices; review on the directive for carotid control hold; application expectations; effects of alcohol, depressants, and stimulants with the carotid; signs of a loss of consciousness; signs of regaining consciousness; step by step expectations of when subject loses consciousness; transport and reporting issues; step by step application and practical training; two practical tests (with a required 100% passing score); written test (with a required 100% passing score).

[7] The Law Enforcement Accountability and Integrity Act, signed into law well after this event on June 19, 2020, banned carotid control holds. *See* C.R.S. § 24-31-901, et seq.

hold may be used, as well as the risks if the hold is used longer than one minute. Annual re-certification for the carotid control hold technique, including a practical test, was required for every sworn member of the department. The re-certification for 2018 was completed in September and October of 2018. In addition to training on the carotid control hold, the APD provided training on sudden death theories, including various types of asphyxia, as well as the need to cease the application of weight to a resistive subject once restrained. APD includes training on excited delirium best practices and requires that each officer pass a written test on the subject.

Training records show that Stoller received training in the use of the carotid hold at the Basic Academy (6 hours) which included written tests he was required to pass with a score of 100%. Additionally, Stoller completed a 40-hour course to become an Aurora arrest control instructor in June of 2018. Stoller assisted in the instruction of the technique at the annual re-certification on October 4, 2018. Further, when asked, Stoller was able to describe and demonstrate a carotid hold, correctly recite the parameters with regards to length of time the hold was to be used, as well as identify the recovery steps to be taken following use of the hold on an individual experiencing excited delirium.

The record as developed demonstrates that APD officers were trained not to use the chokehold and were instead provided thorough training on the use of the carotid control hold. The officer who used the carotid control technique had received recent training and in fact served as an instructor for the annual re-certification of APD officers.

As the above demonstrates, APD forbid the use of chokeholds and provided training on both de-escalation and the reasonable use of the carotid control hold to each of its officers. Plaintiff cannot make the showing required to prove that this training provided to APD officers was constitutionally inadequate.

**2. Plaintiff cannot demonstrate that the circumstances surrounding this use of force were usual and recurring.**

While officers are called to domestic disturbances on a fairly routine basis, the events of December 17, 2018 were anything but usual and routine. Plaintiff must show that the situation the officers encountered was "common" (or at least not "uncommon") *Allen*, 119 F.3d at 842, "likel[y]," *id*. at 845, "foreseeable," *Zuchel v. City and County of Denver*, 997 F.2d 730, 738 (10th Cir. 1993), or "predictable," *id*. Plaintiff cannot demonstrate that any of these adjectives would be applicable to the events in question.

Rarely does one subject, impervious to pain, actively engage in a violent physical altercation with three officers lasting nearly seven minutes prior to being taken into custody. That is extreme. Not one officer could recall having seen or having been involved in anything like it at any time throughout their law enforcement careers. Specifically, Mason, a seasoned

officer with 18 years of law enforcement experience stated she had never been in a situation such as this ever before. This was not an occurrence that is likely to recur to the extent that it would require additional or specialized training other than what was provided by the City.

3. **Plaintiff cannot show deliberate indifference on the part of the City.**

The City denies that it failed to properly train its officers and believes its training on de-escalation as well as the use of the carotid control hold was adequate. If anything, the amount of training and requirement for annual recertification on the carotid control hold demonstrates that the City understood the serious implications of inadequate training in this area and acted decisively to ensure all members of the APD were appropriately trained.

A municipality can incur liability for a failure to train only upon proof of deliberate indifference. *Murphy v. City of Tulsa*, 950 F.3d 641 (10th Cir. 2019) (citation and quotation omitted) (holding that although the city's evidence of training lacked detail, no fact-finder could reasonably infer deliberate indifference in training where the city trained its officers against the violation alleged). To satisfy the stringent deliberate indifference standard, a pattern of similar constitutional violations by untrained employees is ordinarily necessary. *Waller v. City & Cnty. of Denver,* 932 F.3d 1277, 1285 (10th Cir. 2019) (plaintiff failed to show a pattern of prior similar misconduct or that the need for more or different training was otherwise so obvious that the city could be said to have been deliberately indifferent to the need). Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights. *Connick,* 53 U.S. at 62 (citation and quotation omitted).

Plaintiff has produced no evidence to support a finding of deliberate indifference on the part of the City. There had not been other instances in which APD officers violated individual's constitutional rights by their inappropriate use of the carotid control hold or unsuccessful efforts at de-escalation as of December 17, 2018 that would have provided the City notice that the training it was providing its officers was inadequate or that would suggest that the City's training decisions were deliberately indifferent. Moreover, Plaintiff cannot point to any decision-maker who could be said to have disregarded the risk of injury to an arrestee by rejecting suggested training improvements in use of the holds employed upon Mr. Baker or by the need for additional or different de-escalation training.

4. **Plaintiff cannot show a direct causal link between the constitutional deprivation and the allegedly inadequate de-escalation training.**

In order to demonstrate a direct causal link between the constitutional deprivation and the allegedly inadequate de-escalation training, Plaintiff must show how the City's alleged failure to provide training regarding de-escalation actually caused the officer's imposition of excessive force. *Carr v. Castle*, 337 F.3d 1221, 1231 (10th Cir. 2003) (finding that even if some

inadequacy of training had been found, plaintiff remained unable to demonstrate how it was the direct cause of the officer's actions which resulted in a civilian death). A general lack of training is insufficient. *Id*.

The record as developed shows that Mr. Baker was not responsive to any of the verbal commands given to him by the three officers. It demonstrates Mr. Baker was impervious to pain and incapable of effectively communicating with the officers in a coherent manner. This was a lengthy and violent encounter with an individual in a very agitated state. Additional or different training in de-escalation would have done nothing to alter Mr. Baker's mental status or the course of events. As such, any deficiency in the City's training program regarding de-escalation could not have been a direct cause of the alleged constitutional violation here.

Based on the above, the City intends to pursue summary judgment on Plaintiff's sole remaining claim for relief. The City further requests that the Court set a briefing schedule following its review of the Position Statement and Plaintiff's response.

Please feel free to contact me with any questions.

Very truly yours,

Josh A. Marks